UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>APPROXIMATELY 1,360,000.748 TETHER AND $3,859,703.65 IN U.S. CURRENCY,<br><br>    Defendant. | Case No. 23-cv-04400-TSH<br><br>**ORDER GRANTING MOTION FOR DEFAULT JUDGMENT**<br><br>Re: Dkt. No. 15 |

## I.   INTRODUCTION

In this *in rem* forfeiture action, Plaintiff United States of America moves for default judgment against the Defendant Property, which includes approximately 1,360,000.748 Tether ("USDT") and approximately $3,859,703.65. To date, no formal claim or answer has been filed. The Court determines that this matter is appropriate for resolution without a hearing. *See* Civ. L.R. 7-1(b). For the reasons stated below, the Court **GRANTS** the government's motion.

## II.   BACKGROUND

**A.   Factual Allegations**

   **1.   Wire Fraud Scheme**

On or about August 8, 2022, Victim 1, a 61-year-old resident of San Francisco, connected with a person identifying themselves as Hao William Yang on a real-estate platform known as Homesnap. Compl. ¶¶ 21, 23, ECF No. 1. Homesnap is a real-estate listing platform with a consumer-facing application for buyers. *Id.* ¶ 23. Yang claimed to be looking for real estate in the San Francisco Bay Area. *Id.* Two days after the initial contact, Yang sent Victim 1 a message on LINE, an encrypted messaging service headquartered in Japan. *Id.* ¶ 24. Victim 1 and Yang

discussed personal matters on LINE such as their backgrounds, relationship statuses, businesses, and finances. *Id.* Within a week their relationship became personal, with Yang sending many messages about his "love" for Victim 1. *Id.*

During their initial LINE conversation, Yang often discussed cryptocurrency futures trading, unprovoked and unrelated to the topic of conversation. *Id.* ¶ 26. Yang claimed that in addition to being a successful automobile parts manufacturer, he had made millions of dollars through cryptocurrency trading. *Id.* Yang represented himself as a cryptocurrency expert. *Id.*

On or about August 15, 2022, Yang introduced Victim 1 to a company called NYMEX. *Id.* ¶ 27. Yang claimed that NYMEX was a beginner-friendly cryptocurrency exchange based in Chicago. *Id.* Yang directed Victim 1 to download the NYMEX application through a link that he provided through LINE. *Id.* Victim 1 pressed the link, and it downloaded the NYMEX application onto their smartphone. *Id.* Although NYMEX appeared to be a legitimate cryptocurrency platform and application, with graphics and layouts consistent with most extant smartphone currency trading applications, it was, in reality, a fraudulent application. *Id.* ¶ 28. The displayed investment amounts and gains were entirely fictitious, and the perpetrators of the fraud had the ability to adjust the displays as they pleased over the course of the scam to reflect gains on investments when, in reality, no gains were accruing and the funds were not in the exchange account as represented. *Id.*

On or about August 18, 2022, Yang instructed Victim 1 to purchase cryptocurrency known as U.S.D. Coin ("USDC") from cryptocurrency exchanges BitStamp and Coinbase for the purpose of investing into the NYMEX exchange. *Id.* ¶ 29. On August 27, 2022, Victim 1 made their initial investment into the NYMEX application, with a transfer of 199,990.00 USDC from their Coinbase account to a USDC address ending in 2f20 (the "NYMEX address"). *Id.* ¶ 30. Following the initial investment, Victim 1 was able to view their fabricated "earnings" on the NYMEX application, which reported gains of twenty to thirty percent against Victim 1's initial investment in less than a week. *Id.* ¶ 31. Those purported gains were enough to convince Victim 1 to invest an additional $1,099,990.00 in USDC into the NYMEX platform on September 2, 2022. *Id.*

At the request of Yang, Victim 1 asked family members to invest with them. *Id.* ¶ 32. Six family members collectively gave Victim 1 $2,450,000.00 to invest under Yang's guidance, as follows:

    a. Victim 1 invested approximately $3,050,000;

    b. Relative 1 invested approximately $200,000;

    c. Relative 2 invested approximately $200,000;

    d. Relative 3 invested approximately $200,000;

    e. Relative 4 invested approximately $200,000;

    f. Relative 5 invested approximately $600,000; and

    g. Relative 6 invested approximately $1,900,000.

*Id.*

Sometime in September 2022, Victim 1 received multiple message requests in the same day on Homesnap from men living in Asia to view property in San Francisco. *Id.* ¶ 33. When Victim 1 mentioned this oddity to Yang during one of their conversations on LINE, Yang became angry and accused Victim 1 of "cheating" on him. *Id.* Yang demanded that Victim 1 delete their LINE messages up to that point to prove Victim 1's dedication to him. *Id.* Victim 1 did as Yang asked and deleted all previous LINE messages with Yang, including the NYMEX application link. *Id.*

By December 2022, Victim 1's NYMEX account on the fictitious application showed that their and their family's investments had grown to nearly $10,000,000. *Id.* ¶ 34. On or about December 19, 2022, Victim 1 tried to withdraw the $10 million from their NYMEX account but received a message from NYMEX "customer service" saying that Victim 1 needed to pay $200,000 in taxes to withdraw the funds. *Id.* ¶ 35. At Yang's urging, Victim 1 paid the $200,000 in USDC to NYMEX, but they were still unable to withdraw the funds. *Id.* Victim 1 ultimately learned of the fraud when they reported the incident to Coinbase and Bitstamp. *Id.*

Between August 27, 2022 and December 14, 2022, Victim 1, on their own and on behalf of their relatives, conducted 16 investment transactions into the NYMEX exchange totaling approximately 5.5 million USDC from their accounts at Coinbase and Bitstamp. *Id.* ¶ 36. The 16

transfers were all sent to the NYMEX Address.  *Id.*

### 2. Laundering

For each of Victim 1's transactions, the funds were traced on the publicly available blockchain through a series of transfers between cryptocurrency addresses, known as hops, to their arrival at the Subject Account.  *Id.* ¶ 41.  Victim 1's funds were swapped for various cryptocurrencies, specifically, DAI, USDC, and Tether (or "USDT").[1]  *Id.* ¶ 42.  All three of these cryptocurrencies are known as stablecoin, a virtual currency whose value is tied to that of another "stable" currency, commodity, or financial instrument.  *Id.* ¶¶ 14, 42.  DAI is issued by MakerDAO, a foundation headquartered in Denmark.  *Id.* ¶ 15.  USDC is issued by Centre, a company headquartered in the U.S.  *Id.* ¶ 17.  USDT is issued by Tether Ltd., a company headquartered in Hong Kong.  *Id.* ¶ 14.  Each of their respective values are tied to the U.S. Dollar at a ratio of approximately 1:1.  *Id.* ¶ 42.  As such, there is no apparent financial or legitimate business benefit to conducting the swaps performed in this instance.  *Id.*  Indeed, each of the swaps and transfers resulted in a net loss due to fees paid for the swaps and subsequent transfers.  *Id.*

During the funds tracing and analysis, law enforcement analyzed the DAI, USDC, and USDT wallet addresses utilized in the various hops between Victim 1's initial transactions to the NYMEX Address and the funds' ultimate arrival in the Subject Account.  *Id.* ¶ 43.  That analysis revealed a pattern where the same addresses appeared in other complaints where individuals reported falling victim to scams.  In these instances, law enforcement located victim complaints on either the FBI's Internet Crime Complaint Center, known as IC3 (http://www.ic3.gov), or the Federal Trade Commission's Consumer Sentinel Database (http:/reportfraud.ftc.gov).  *Id.*  The cryptocurrency tracing revealed two separate transaction paths, both of which ultimately ended

---

[1] Tether, widely known as "USDT," is a blockchain-based cryptocurrency whose tokens in circulation are backed by an equivalent amount of U.S. dollars, making it what is known as a "stablecoin."  *Id.* ¶ 14.  A stablecoin is a virtual currency whose value is tied to that of another "stable" currency, commodity, or financial instrument.  *Id.*  USDT is issued by Tether Ltd., a company headquartered in Hong Kong.  *Id.*  Tether is connected to Bitfinex, a cryptocurrency exchange located in the British Virgin Islands.  *Id.*

4

with deposits into the Subject Account. *Id.* ¶ 44.[2]

### 3. Additional Fraud

Victim 1's funds were traced through 14 hops before arriving at the Subject Account. *Id.* ¶¶ 70-74. The government analyzed each of the addresses in the movement of funds and repeatedly located reports of additional fraud. *Id.* ¶ 70. These victims collectively reported losses of approximately $2,118,23.14. *Id.* ¶ 75.

Another victim ("Victim 2") reported another scam who was similarly induced to "invest" in a fraudulent cryptocurrency exchange. *Id.* ¶ 76. Victim 2 was contacted on LinkedIn by a person identifying themselves as Dot Qian, who said she was investing cryptocurrency and making large profits on those investments. *Id.* ¶ 77. Qian offered to assist Victim 2 in conducting similar investments and told them to send Ethereum to a deposit address ending in 2C39fF66. *Id.* ¶ 78. Over the course of 20 days, from December 1 to December 20, 2022, Victim 2 sent a total of 157.01 Ethereum across six transactions and 40,002.33 USDC to the 2C39fF66 address. *Id.* ¶ 79. Law enforcement traced the path Victim 2's Ethereum took and found that it was converted to DAI, combined with other funds, and then converted to USDT before being deposited into the Subject Account. *Id.* ¶ 80. Law enforcement traced the path Victim 2's USDC took and found that it was converted to DAI, combined with other funds, and then converted to USDT before arriving in the subject account. *Id.* ¶ 81. Based on the tracing, the subject account received the full value of Victim 2's stolen funds, to wit, 157.01 Ethereum and 40,002.33 USDC. *Id.* ¶ 82.

Pursuant to a seizure warrant obtained on March 7, 2023, the government sought to seize the assets held in the Subject Account for forfeiture as proceeds of money laundering. *Id.* ¶ 83. The government subsequently learned that between the time the warrant was served and the time it took to freeze the funds, the funds in the account were converted to Australian Dollars ("AUD"). *Id.* ¶ 84. Specifically, the account contained 5,767,900 AUD, along with 200,000.748 of the original USDT, all of which was traceable to the original funds subject to the seizure warrant. *Id.* A second seizure warrant was obtained on March 15, 2023. *Id.* Prior to being transferred from the

---

[2] The transaction details are listed in the government's complaint at paragraphs 45-69.

1  Subject Account, the AUD contained therein was converted to U.S. Dollars so that they could be
2  processed by the Federal Reserve in a wire transaction. The resulting U.S. Currency is one of the
3  Defendant Properties in this case as those funds constitute the proceeds of the wire fraud scheme,
4  as well as the proceeds of the money laundering that followed. *Id.*

On March 21, 2023, the government learned that approximately five hours after the service of the initial warrant, the Subject Account received an additional USDT deposit of 1,160,000 USDT. *Id.* ¶ 85. This deposit was received into the Subject Account via a USDT address ending in 5LuH. *Id.* The source of these funds was a transfer from a second cryptocurrency exchange account traced three hops prior. *Id.* This account was owned by a 37-year-old Chinese national. *Id.* ¶ 86. Moreover, an Ethereum USDT address used by this account to receive USDT, to wit, an address beginning with 0x12b0897f. *Id.* The government analyzed incoming USDT deposits into the 0x12b0897f address and observed a frequent pattern where this account repeatedly interacted with other USDT addresses involved in a variety of scams, per reports of fraud to the FBI. *Id.* ¶ 87. Specifically, the government identified eight separate USDT addresses where 29 individuals reported sending their funds as part of a scam. *Id.* ¶ 88. These individuals reported their scams to IC3 and reported losing over $2.6 million to fraud. *Id.*

### B. Procedural Background

On August 25, 2022, the government filed a verified complaint seeking the forfeiture of the Defendant Property. Compl., ECF No. 1. The government brings two claims for forfeiture under 18 U.S.C. § 981: (1) wire fraud in violation of 18 U.S.C. § 1343 and (2) money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). *Id.* ¶¶ 2, 89-93.

After the government filed the complaint, it published notice of the action on the official government forfeiture website (www.forfeiture.gov) for 30 consecutive days, beginning on September 8, 2023, as required by Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure (the "Supplemental Rules") and Rule 6-1 of the Admiralty & Maritime Local Rules of the Northern District of California. ECF No. 8. On September 6, 2023, the government sent notice of this forfeiture action, including the complaint and notice, to then-counsel for the only known potential claimant.

1  Phillips Decl., Ex A, ECF No. 15-1.  While counsel has since represented they "no longer

2  represent the prospective claimants," *id.* at 1, when counsel accepted service of the complaint they

3  did so pursuant to their representation of the only known potential claimant, *id.* at 2.

4      On December 13, 2023, the Clerk of Court entered default as to the Defendant Property.

5  ECF No. 13.  The government filed the present motion on December 29, 2023.

### III.   MAGISTRATE JUDGE JURISDICTION

7      As an initial matter, the Court must address whether it has jurisdiction to enter judgment.

8  Under 28 U.S.C. § 636(c)(1), a magistrate judge may enter judgment in a civil action "[u]pon the

9  consent of the parties."  The term "parties" under 28 U.S.C. § 636(c)(1) includes "all plaintiffs and

10  defendants named in the complaint—irrespective of whether the complaint has been properly

11  served."  *Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017).

12      In *in rem* actions such as this, the action is against the property itself.  Only those who file

13  a claim to the property are parties to the actions, such that their consent to magistrate judge

14  jurisdiction becomes necessary.  *See United States v. Real Prop.*, 135 F.3d 1312, 1317 (9th Cir.

15  1998) ("[A]bsent the filing of a claim to a property subject to forfeiture, a putative claimant is not

16  a party to the action;" it is therefore unnecessary to obtain the consent of the putative claimant to

17  the jurisdiction of a magistrate judge prior to the entry of a default judgment against the claimant's

18  interest in the property) (citation and internal quotation marks omitted).  These principles remain

19  undisturbed after *Williams*.  *See Williams*, 875 F.3d at 504 (recognizing the principles in *Real*

20  *Property* as applicable to in rem actions, and explaining that the "same principle[s]" did not apply

21  to the case before it because, among other reasons, it was not *in rem*); *Keefe Kaplan Mar., Inc. v.*

22  *Vessel "Cygnet,"* 2018 WL 534300, at *2 (N.D. Cal. Jan. 24, 2018) (explaining that the Ninth

23  Circuit "affirmed [the] narrow exception" for magistrate jurisdiction consent described in *Real*

24  *Property* for *in rem* forfeiture proceedings).

25      Applying these principles, this action is *in rem* against the Defendant Property.  Notice was

26  provided to all putative claimants, and no one has filed a claim to the property.  The only party in

27  this action is the government, which has consented to this Court's jurisdiction pursuant to 28

28  U.S.C. § 636(c)(1).  ECF No. 4.  Therefore, this Court has jurisdiction to enter default judgment.

*See, e.g., Keefe Kaplan Mar., Inc.*, 2018 WL 534300, at *2 (finding magistrate jurisdiction to enter default judgment against a vessel in *in rem* forfeiture action upon the consent of the plaintiff, which was the only party to the action).

### IV.   LEGAL STANDARD

#### A.   Civil Forfeiture

Forfeiture is a "harsh and oppressive procedure" that is "not favored by the courts." *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1069 (9th Cir. 1994). The Ninth Circuit is "particularly wary of civil forfeiture statutes" because they "impose 'quasi-criminal' penalties" but do not provide property owners with the degree of procedural protections provided to criminal defendants. *See id.* at 1068; *United States v. Marolf*, 173 F.3d 1213, 1217 (9th Cir. 1999) (quoting *$191,000.00 in U.S. Currency*, 16 F.3d at 1068). Accordingly, strict adherence to procedural rules is paramount in civil forfeiture proceedings. *See Marolf*, 173 F.3d at 1217 (denying forfeiture where government "erred" by failing to provide due notice to property owner); *see also $191,000.00 in U.S. Currency*, 16 F.3d at 1068-69 (strictly construing currency forfeiture provisions of 19 U.S.C. § 615 against government and holding that "the burden on the government to adhere to procedural rules should be heavier than on claimants"). Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Claims Rule G provides the procedural contours "govern[ing] a forfeiture action in rem arising from a federal statute." Fed. R. Supp. G(1).

#### B.   Default Judgment

Federal Rule of Civil Procedure 55(b)(2) permits a court, following default by a defendant, to enter default judgment in a case. "The district court's decision whether to enter default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

At the default judgment stage, the factual allegations of the complaint, except those concerning damages, "together with other competent evidence submitted" are deemed admitted by the non-responding parties. *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1000 (N.D. Cal. 2001); *see also Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) ("With respect to the determination of liability and the default judgment itself, the general rule is

8

that well-pled allegations in the complaint regarding liability are deemed true."). "However, a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (citation and quotation omitted)). Therefore, "necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)); *accord DIRECTV*, 503 F.3d at 854. Further, the scope of relief is limited by Federal Rule of Civil Procedure 54(c), which states that a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

In determining whether default judgment is appropriate, the Ninth Circuit has enumerated the following factors for courts to consider:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

## V. DISCUSSION

### A. Jurisdiction

In considering whether to enter default judgment, a district court must first determine whether it has jurisdiction over the subject matter and the parties to the case. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). "[T]he district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) (considering subject matter jurisdiction on a 12(b)(1) motion).

#### 1. Subject Matter Jurisdiction

The Court has subject matter jurisdiction under 28 U.S.C. §§ 1345 and 1355 and 18 U.S.C. § 981 because the Defendant Property constitutes or is derived from proceeds obtained, directly or indirectly, from violations of 18 U.S.C. §§ 1343 and 1956. *See* 28 U.S.C. § 1345 ("Except as

1   otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all
2   civil actions, suits or proceedings commenced by the United States, or by any agency or officer
3   thereof expressly authorized to sue by Act of Congress."); 28 U.S.C. § 1355 ("The district courts
4   shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding
5   for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred
6   under any Act of Congress[.]"); *see also United States v. $6,190.00 in U.S. Currency*, 581 F.3d
7   881, 884 (9th Cir. 2009) (discussing district court's subject matter jurisdiction in civil forfeiture
8   proceeding brought pursuant to 18 U.S.C. § 981).

### 2.   *In Rem* Jurisdiction

The Court must also determine whether it has jurisdiction over the Defendant Property. *See In re Tuli*, 172 F.3d at 712.  *In rem* jurisdiction treats an item of property as a person against whom suits can be filed and judgments can be entered.  *United States v. $29,959.00 U.S. Currency*, 931 F.2d 549, 551 (9th Cir. 1991).  The Ninth Circuit relies on a plain reading of 28 U.S.C. § 1355(b) as the appropriate jurisdictional test for *in rem* proceedings.  *United States v. Approximately $1.67 Million (US) in Cash, Stock & Other Valuable Assets*, 513 F.3d 991, 996 (9th Cir. 2008).  That statute provides that "[a] forfeiture action or proceeding may be brought in the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred."  28 U.S.C. § 1355(b)(1)(A).

A district court obtains *in rem* jurisdiction when it issues a warrant for arrest of the defendant property and that warrant is successfully served.  *See Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 424 F.3d 852, 858 (9th Cir. 2005) ("Once the district court issued warrants for the arrest of the three vessels pursuant to Rule C, and the warrants were successfully served, 'jurisdiction was complete.'").  On September 6, 2023, this court issued a warrant for arrest for the Defendant Property.  ECF No. 7.  The same day the warrant was served on then counsel for the only known potential claimant.  Phillips Decl., Ex. A.  In addition, the government had already seized the Defendant Property pursuant to seizure warrants issued on March 7, 2023, and March 15, 2023.  Compl. ¶¶ 83-84.  Thus, the Court has *in rem* jurisdiction over this civil forfeiture.

**B.     Notice**

Supplemental Rule G(4) requires the government to provide both general notice to the public and direct notice of the forfeiture action to any known person who reasonably appears to be a potential claimant. Fed. R. Civ. P. Supp. G(4)(a), (b); *see also United States v. $22,050.00 U.S. Currency*, 595 F.3d 318, 320 n.1 (6th Cir. 2010) ("Under the Supplemental Rules, the government does not have to comply with the formal service of process provisions of Federal Rule of Civil Procedure 4 when providing notice of forfeiture to potential claimants. This is because potential claimants are not defendants in an *in rem* action, the seized objects or assets are. Instead, all that is required is that the government provide notice of the action 'to any person who reasonably appears to be a potential claimant on the facts known to the government . . . by means reasonably calculated to reach the potential claimant.'").

**1.     Notice by Publication**

Rule G(4)(a)(ii) provides that "a published notice must: (A) describe the property with reasonable particularity; (B) state the times under Rule G(5) to file a claim and to answer; and (C) name the government attorney to be served with a claim and answer." Here, the government published notice of the action on an official government website (www.forfeiture.gov) for 30 consecutive days, beginning on September 8, 2023, as required by Rule G of the Federal Rules of Civil Procedure and Rule 6-1 of the Admiralty & Maritime Local Rules of the Northern District of California. ECF No. 8. An individual who receives notice by general publication must first file a claim to the property with the court no later than 60 days after the first date of publication on an official government forfeiture website. Fed. R. Civ. P. Supp. G(5)(a)(ii)(A). Sixty days after September 8, 2023, (the first date of publication) is November 7, 2023. Sixty days after October 7, 2023 (the last date of publication) is December 6, 2023. The notice names Chris Kaltsas as the government attorney to be served with the claim and answer. Thus, the government has satisfied the requirements of Rule G(4)(a)(ii).

**2.     Notice to Known Claimants**

Supplemental Rule G(4)(b) also sets forth the requirements for notice to known potential claimants. It states that "[t]he government must send notice of the action and a copy of the

11

complaint to any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim under Rule G(5)(a)(ii)(B)." Fed. R. Civ. P. Supp. G(4)(b)(i). The notice must state "(A) the date when the notice is sent; (B) a deadline for filing a claim, at least 35 days after the notice is sent; (C) that an answer or a motion under Rule 12 must be filed no later than 21 days after filing the claim; and (D) the name of the government attorney to be served with the claim and answer." Fed. R. Civ. P. Supp. G(4)(b)(ii).

On September 6, 2023, the government sent notice of this forfeiture action, including the complaint, notice, and warrant, by email to the only known potential claimant's counsel. Phillips Decl., Ex. A. Counsel "accept[ed] this as service of process." *Id.* at 2. Supplemental Rule G does not require notice to be provided by a specific means but instead contemplates that "notice must be sent by means reasonably calculated to reach the potential claimant." Fed. R. Civ. P. Suppl. G(4)(b)(iii)(A). And courts have acknowledged that sending notice via email is "an appropriate form of notice" when a case, as here, involves "international defendants whose locations are hard to pin down and the nature of the crimes necessarily entails some degree of cyber-proficiency . . . ." *United States v. Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d 1, 6 (D.D.C. 2020). The potential claimant's claim was due by October 11, 2023, which is 35 days from September 6, 2023. To date, the potential claimant has not filed a claim or otherwise entered this action, and the time to do so has elapsed.

In sum, the government has adhered to the procedural rules governing civil forfeiture actions as required by federal statute. The Court now addresses whether default judgment is warranted.

**C.   *Eitel* Factors**

Applying the seven *Eitel* factors, the undersigned finds default judgment is warranted in favor of Plaintiff.

**1.   The Possibility of Prejudice**

The first factor the Court considers is the possibility of prejudice if a default judgment is not entered. *Eitel*, 782 F.2d at 1471–72. This factor weighs in favor of default judgment "when a defendant has failed to appear or defend against a suit, and the plaintiffs could not otherwise seek

12

relief." *Vietnam Reform Party v. Viet Tan - Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (citations omitted); *IO Grp., Inc. v. Jordon*, 708 F. Supp. 2d 989, 997 (N.D. Cal. 2010) (prejudice exists where denying the requested default judgment would leave the plaintiff without a proper remedy).

Here, no party has attempted to oppose the verified complaint or otherwise make a claim against the Defendant Property. If the government's motion is not granted, it "will have no other opportunity to establish its right to the Currency pursuant to the verified complaint." *United States v. Approximately $50,000 in U.S. Currency*, 2017 WL 3616443, at *6 (N.D. Cal. Aug. 7, 2017), *report and recommendation adopted*, 2017 WL 3605224 (N.D. Cal. Aug. 22, 2017). Therefore, the first factor weighs in favor of default judgment.

### 2. Substantive Claims and the Sufficiency of the Complaint

The second and third *Eitel* factors focus on the merits of the substantive claims and the sufficiency of the complaint. *Eitel*, 782 F.2d at 1471–72. "These two factors are often analyzed together and require courts to consider whether a plaintiff has 'state[d] a claim on which [it] may recover.'" *Vietnam Reform Party*, 416 F. Supp. 3d at 962 (quoting *PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002)). "Of all the *Eitel* factors, courts often consider the second and third factors to be 'the most important.'" *Id.* (quoting *Sanrio, Inc. v. Jay Yoon*, 2012 WL 610451, at *4 (N.D. Cal. Feb. 24, 2012)).

The government brings its claims pursuant to 18 U.S.C. § 981(a)(1), under which property linked to violations of 18 U.S.C. §§ 1343 and 1956 are subject to forfeiture. Section 1343 prohibits transmitting "by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing" a scheme to defraud. Section 1956(a)(1)(B)(i) prohibits conducting financial transactions with funds known to be the proceeds of unlawful activity for the purpose of concealing or disguising the proceeds.

The facts set forth in the government's complaint establish that the Defendant Property is property traceable to wire-fraud victims, property involved in money laundering, or both. *See generally* Compl. ¶¶ 20-88. Further, as required by Supplemental Rule G(2), the government's

complaint:

> 1. is verified by Special Agent Alfonso Speed from the U.S. Secret Service (Compl. Verification, ECF No. 1 at 18);
>
> 2. states the grounds for subject matter jurisdiction and venue (Compl. ¶¶ 1-5);
>
> 3. describes the property with reasonable particularity (*id.* ¶ 7);
>
> 4. states the location where the seizure occurred (*id.* ¶¶ 7, 83-88);
>
> 5. identifies the statues under which forfeiture is sought (*id.* ¶¶ 1, 89-93); and
>
> 6. states sufficiently detailed facts (as discussed above) to support a reasonable belief that the government will be able to meet its burden of proof at trial (*id.* ¶¶ 20-88).

Thus, the Court finds the government's complaint is sufficient and there are sufficient facts alleged to show that the Defendant Property is subject to forfeiture. These factors both favor default judgment.

### 3. The Sum of Money at Stake in the Action

Under the fourth *Eitel* factor, "the Court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct." *Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1050 (N.D. Cal. 2010) (citation and quotation marks omitted). When the amount at stake is substantial or unreasonable in light of the allegations in the complaint, default judgment is disfavored. *See Eitel*, 782 F.2d at 1472 (affirming the denial of default judgment where the plaintiff sought $3 million in damages and the parties disputed material facts in the pleadings). "However, when the sum of money at stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate." *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1100 (N.D. Cal. 2014).

The government represents the Defendant Property consists of approximately 1,360,000.748 USDT and approximately $3,859,703.65. In total, the Defendant Property is worth about $5.2 million. Mot. at 8. While $5.2 million is not an insignificant sum, no person has come forward to challenge the forfeiture, despite the only known potential claimant receiving direct notice of this case. Thus, default judgment is reasonable in relation to the defaulting parties'

14

conduct. *See, e.g., United States v. Approximately $94,600 in U.S. Currency*, 2018 WL 2215845, at *8 (N.D. Cal. May 15, 2018) (finding this factor favors default judgment in forfeiture case where "the Currency represents the entire amount of money actually seized" and "[n]o person has come forward to challenge the forfeiture").

### 4. The Possibility of Dispute Concerning Material Facts

The fifth *Eitel* factor examines the likelihood of dispute between the parties regarding the material facts surrounding the case. *Eitel*, 782 F.2d at 1471–72. However, upon entry of default, the defendant is "deemed to have admitted all well-pleaded factual allegations" in the complaint. *DIRECTV, Inc.*, 503 F.3d at 851 (citing Fed. R. Civ. P. 55(a)).

The likelihood of dispute in this case is minimal. As outlined above, the government published appropriate notice of this action and served notice upon the only known potential claimant. Having been made aware of the case, no potential claimant has chosen to enter the action. Since this case began, no dispute regarding any material facts has been raised. Thus, this factor, too, weighs in the government's favor.

### 5. Whether Default was Due to Excusable Neglect

The sixth *Eitel* factor examines whether the defendant's failure to respond to the complaint was the result of excusable neglect. *Eitel*, 782 F.2d at 1471–72. Here, the government properly served the known potential claimant, but no claim was ever filed in court and there was no response to the motion for default judgment. Further, there is nothing in the record suggesting this failure is based on excusable neglect. Given this record, there is nothing suggesting that the failure to file a claim or otherwise participate in this litigation is due to excusable neglect, and this factor supports default judgment.

### 6. Policy Favoring Deciding a Case on its Merits

The last *Eitel* factor examines whether the policy of deciding a case based on the merits precludes entry of default judgment. *Eitel*, 782 F.2d at 1472. In *Eitel*, the Ninth Circuit admonished that "[c]ases should be decided on their merits whenever reasonably possible." *Id.* "The existence of Federal Rule of Civil Procedure 55(b), however, shows that this policy is not dispositive." *McMillan Data Commc'ns, Inc. v. AmeriCom Automation Servs., Inc.*, 2015 WL

15

4380965, at *11 (N.D. Cal. July 16, 2015) (citing *Kloepping v. Fireman's Fund*, 1996 WL 75314, at *3 (N.D. Cal. Feb. 13, 1996)). Further, no claimant has come forward to contest the forfeiture, making it impossible to obtain a decision on the merits. *See Approximately $50,000 in U.S. Currency*, 2017 WL 3616443, at *7 (finding that the seventh *Eitel* factor did not outweigh the other six factors where there was no claimant in the case, and, as such, it was not possible to obtain a decision on the merits).

### 7. Summary of the *Eitel* Factors

In sum, the majority of the *Eitel* factors weigh in favor of granting default judgment.

## VI. CONCLUSION

For the reasons stated above, the Court **GRANTS** the government's motion for default judgment against the Defendant Property. The government shall file a proposed form of judgment within 14 days of the date of this order, after which judgment will be entered separately.

**IT IS SO ORDERED.**

Dated: January 30, 2024

_____
THOMAS S. HIXSON
United States Magistrate Judge